### UNITED MINE WORKERS OF AMERICA, INTERNATIONAL UNION, Petitioner,

### v.

### Elizabeth H. DOLE, in her capacity as Secretary of Labor, et al., Respondents,

### American Mining Congress, Intervenor.

### No. 88–1238.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1988.

Decided March 10, 1989.

As Amended March 10, 1989.

Michael Dinnerstein, with whom Michael H. Holland, Washington, D.C., was on the brief, for petitioner. Mary Lu Jordan, Washington, D.C., also entered an appearance for petitioner.

M. Peter Garcia, Atty., Dept. of Labor, with whom George R. Salem, Sol., Dennis D. Clark, Counsel, Appellate Litigation, Washington, D.C., and Linda L. Leasure, Atty., Dept. of Labor, Arlington, Va., were on the brief, for respondents.

Colleen A. Geraghty also entered an appearance for respondents.

Timothy M. Biddle and Thomas C. Means, Washington, D.C., were on the brief, for intervenor. Luther Zeilger, Washington, D.C., also entered an appearance for intervenor.

Before WALD, Chief Judge, and EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

In this case we review new regulations on roof support in underground coal mines. Roof cave-ins due to a lack of adequate support are the leading cause of fatalities and injuries in underground mining: roof falls account for almost half of all underground coal-mining deaths. Injuries from roof falls are over eight times as likely to be fatal as injuries from other causes. *Safety Standards for Roof, Fall and Rib Support*, 53 Fed.Reg. 2,354 (1988) (final rule) ("*Roof Support Standards*"). Roof falls also exacerbate the number of injuries and fatalities attributable to other causes, such as underground fires, by blocking escapeways or hampering ventilation.

In 1988 the Secretary of Labor ("Secretary"), acting through the Mine Safety and Health Administration ("MSHA"), promulgated new standards, some of which replaced existing standards governing the use of bolts for roof support and the procedures to be followed in removing roof supports, and others of which established original standards for a new type of "longwall" mining. Under the Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C.A. §§ 801–962 (1986), the Secretary is authorized to replace existing mandatory health and safety standards only if the new standards provide at least the same level of protection to miners as the old ones (the "no-less protection rule," 30 U.S.C.A. § 811(a)(9)). There is no similar constraint on original standards.

In this appeal, the United Mine Workers of America ("Union") first challenges the new roof bolt and support removal standards on the ground that they do not satisfy the no-less protection rule. We find that the existing regulations do establish mandatory standards, and consequently the Secretary was required to ensure that the new regulations did not reduce miner protection. The statement of basis and purpose, however, makes no mention whatsoever of this requirement. The statement of basis and purpose is therefore inadequate and the challenged regulations are invalid.[1]

The remaining challenge by petitioner Union concerns the safety procedures for longwall mining, not previously addressed in MSHA's standards. We find the longwall standards to be consistent with the statute and uphold them as valid products of the informal rulemaking process.

### I. JURISDICTION

At the outset we deal with the Secretary's contention that the Union's petition for judicial review is jurisdictionally defective because it was filed too late with this court.

The Mine Act requires that a petition challenging a new standard be filed "prior to the sixtieth day after such standard is promulgated." 30 U.S.C.A. § 811(d). The standards at issue here were promulgated on January 27, 1988. The Union's petition for review was recorded as filed by the clerk of this court on March 28, 1988—the "sixty-first day" after promulgation. If read literally to require filing prior to the sixtieth day, the statute would have required the petition to be filed on Saturday, March 26. Although the court is not open on Saturdays, the Secretary contends nonetheless that the filing recorded on Monday was out of time, thereby depriving the court of any jurisdiction over the appeal.

We disagree. We believe Fed.R.App.P. 26(a) provides the rule for computing time periods here:

---

**1.** By separate order today we have requested that the parties submit supplementary briefs addressing the issue of whether the court should

vacate the new regulations pending further proceedings by the Secretary consistent with our opinion.

(a) Computation of Times. In computing any period of time prescribed by these rules, by an order of court, *or by any applicable statute,* the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period shall be included, *unless it is a Saturday, a Sunday, or a legal holiday,* in which event the period extends until the end of the next day which is not a Saturday, a Sunday, or a legal holiday.

(Emphasis added.) The Mine Act is such an "applicable statute." It makes no separate provision for the computation of time and was enacted subsequent to the adoption of Rule 26(a); we conclude therefore that Congress intended its time periods to be computed in accordance with the federal rule. The Supreme Court has held, for analogous reasons, that the nearly identical time-computation provision in Fed.R.Civ.P. 6(a) is properly used to interpret the time period for taking appeals to that Court, 28 U.S.C.A. § 2101 (1982). *Union National Bank v. Lamb,* 337 U.S. 38, 40–41, 69 S.Ct. 911, 912–13, 93 L.Ed. 1190 (1949).[2] In addition, this circuit has a long-established rule, based in the common-law, that statutory

time periods are to be construed so as to exclude Sundays. *Sherwood Brothers, Inc. v. District of Columbia,* 113 F.2d 162 (D.C.Cir.1940).

■ We therefore confirm our circuit's rule that time periods, including jurisdictional time periods, are to be construed in accordance with Fed.R.App.P. 26(a), excluding final weekend days and holidays unless a specific statutory provision requires otherwise.[3] In so doing we decline to follow the analysis of the Sixth Circuit, urged on us by the Secretary, which reasons that applications of the federal rules to statutory time periods unjustifiably enlarge the jurisdiction of the federal courts.[4] *See, e.g., In re Butcher,* 829 F.2d 596 (6th Cir. 1987), *cert. denied sub nom. Martin v. First National Bank,* — U.S. ——, 108 S.Ct. 1058, 98 L.Ed.2d 1020 (1988) (and cases cited therein). We agree instead with the Third Circuit that "this contention ... is [ ] frivolous." *Frey v. Woodard, supra* note 2, at 175. Statutory provisions laying down time periods for taking appeals, like any other enactments, must be interpreted and applied by courts; in so doing we use the federal rules as guides. Surely "the jurisdiction of the federal

**2.** This decision predated the adoption of the Federal Rules of Appellate Procedure in 1968, at which time the "appeals" provisions of the Federal Rules of Civil Procedure were deleted. Order of December 4, 1967, 389 U.S. 1065 (1967). Fed.R.Civ.P. 6(a) was not among those "appeals" provisions, so it is possible that Rule 6(a) can still be relied on for interpreting time periods for appeals. The same rule now set out in the appellate rules of procedure, Fed.R.App.P. 26(a), seems, however, to be the more appropriate source. The reasoning of *Lamb,* that the federal rules of procedure can be relied on for interpreting a statutory time period in the absence of any more statute-specific provisions or indication that Congress did not intend the rules to apply, has continuing vitality.

**3.** *Accord Funbus Systems v. California Public Utilities Commission,* 801 F.2d 1120, 1124 (9th Cir.1986) (time for appealing ICC orders construed in accordance with Fed.R.App.P. 26(a)); *Miller v. U.S. Postal Service,* 685 F.2d 148 (5th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983) (Fed.R.App.P. 26(a) applies to appeal from Merit Systems Protection Board). *Cf. Frey v. Woodard,* 748 F.2d 173, 174–76 (3d Cir.1984) (Fed.R.Civ.P. 6(a) applies to time for filing tort claim against U.S.); *In re*

*Gotham Provision Co.,* 669 F.2d 1000, 1012–14 (5th Cir.1982), *cert. denied sub nom. First State Bank of Miami v. Gotham Provision Co.,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982) (Fed.R.Civ.P. 6(a) applies to time for filing notice of claim with agency); *Kane v. Douglas, Elliman, Hollyday & Ives,* 635 F.2d 141 (2d Cir. 1980) (Fed.R.Civ.P. 6(a) applies to time for filing Title VII claim); *Wirtz v. Peninsula Shipbuilders Association,* 382 F.2d 237 (4th Cir.1967) (Fed.R.Civ.P. 6(a) applies to time for filing labor-management claim); *Johnson v. Flemming,* 264 F.2d 322, 323 (10th Cir.1959) (Fed.R.Civ.P. 6(a) applies to time for filing appeal under Social Security Act); *Simon v. Commissioner of Internal Revenue,* 176 F.2d 230, 231–32 (2d Cir. 1949) (Fed.R.Civ.P. 6(a) applies to time for filing appeal from Tax Court).

**4.** The Sixth Circuit itself, however, draws a distinction between the methods of computing the time periods for filing an initial claim with a court or agency and those for filing an appeal and finds that only the former impermissibly expand jurisdiction. *See, e.g., Butcher, supra.* It is on the basis of this distinction that the Sixth Circuit reconciles its cases with the Supreme Court's precedent in *Lamb. See id.* at 600, n. 6 and n. 7.

courts to construe the [jurisdictional provisions of a] statute cannot be a matter of serious dispute." *Id.* The Union's petition is properly before us.

## II. THE NO-LESS PROTECTION RULE

### A. *Standard of Review*

The Secretary of Labor, acting through MSHA, is empowered by the Federal Mine Safety and Health Act of 1977, 30 U.S.C.A. §§ 801–962 (1986), to promulgate and enforce safety and health standards with which coal mine operators must comply.[5] Congress itself established interim standards in the Act to remain in force until superseded by the exercise of this rulemaking authority.

Congress also placed an explicit constraint on the Secretary's authority to alter the level of protection afforded miners. In particular, regulations promulgated initially to replace Congress's own interim standards or subsequently to replace existing *mandatory* standards must comport with the "no-less protection rule", § 101(a)(9) of the Act, which provides that "No mandatory health or safety standard promulgated under this subchapter shall reduce the protection afforded miners by an existing mandatory health or safety standard." 30 U.S.C.A. § 811(a)(9) (1986).

Thus when new standards replace existing mandatory health or safety standards it is not sufficient that the new standards demonstrate a reasonable accommodation of the competing goals of safety and efficient coal mine operation. The statute expressly mandates that no reductions in the level of safety below existing levels be permitted, regardless of the benefits accruing to improved efficiency.

As always, our review of an agency's exercise of its rulemaking authority is limited in nature. The Mine Act is explicit in § 101, 30 U.S.C.A. § 811(a), in providing that rulemaking procedures under the Act must comply with the notice and comment procedures set out in § 553 of the Administrative Procedure Act, 5 U.S.C.A. §§ 551,

*et seq.,* and §§ 701, *et seq.* (1977) ("APA"); failure to comply with required § 553 procedures renders agency action arbitrary and capricious and therefore invalid. *See Motor Vehicle Manufacturers Association v. Ruckelshaus,* 719 F.2d 1159, 1164 (D.C. Cir.1983). These procedures require, among other things, that the Secretary "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C.A. § 553(c). We have recently explained how this circuit interprets the requirement:

> This statement need not be an exhaustive, detailed account of every aspect of the rulemaking proceedings; it is not meant to be the more elaborate document, complete with findings of fact and conclusions of law, that is required in an on-the-record rulemaking. On the other hand, this Court has cautioned against "an overly literal reading of the statutory terms 'concise' and 'general' . . . [which] must be accommodated to the realities of judicial scrutiny." At the least, such a statement should indicate the major issues of policy that were raised in the proceedings and explain why the agency decided to respond to these issues as it did, *particularly in light of the statutory objectives that the rule must serve.*

*Independent U.S. Tanker Owners Committee v. Dole,* 809 F.2d 847, 852 (D.C.Cir.), *cert. denied sub nom. Atlantic Richfield Co. v. Independent U.S. Tanker Owners Committee,* —— U.S. ——, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987) (emphasis added; citations omitted).

The dictates of the no-less protection rule are plainly among the objectives of the Act; more importantly, the rule represents an explicit constraint on the Secretary's authority. While the arbitrary and capricious standard of review is "highly deferential and presumes the validity of agency action," *Motor Vehicle Manufacturers, supra,* 719 F.2d at 1164, meaningful and properly deferential judicial review of whether the Secretary's action is "in

---

5. The 1977 Act amended the Coal Act of 1969 and extended its regulatory regime to under-

ground mines other than coal mines. *See infra* at n. 7.

excess of statutory jurisdiction, authority or limitations, or short of statutory right," 5 U.S.C.A. § 706(2)(C) (APA standard of review) requires that the Secretary set out in her statement of basis and purpose the basis for the conclusion required of her that new regulations comport with the no-less protection directive. *See City of New York v. FCC,* 814 F.2d 720, 728 (D.C.Cir. 1987), *aff'd,* —— U.S. ——, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988) (agency failure to explicitly consider statutory limits on authority in statement of basis and purpose renders rulemaking defective); *Independent Tankers, supra.* The absence of an explanation puts the reviewing court in the position of having to substitute its own judgment on the comparative protectiveness of old and new regulations for that of the Secretary, and this we cannot do.[6] *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Nor can we provide an explanation that the Secretary herself has not proffered. *S.E.C. v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). Accordingly, the court must find that the Secretary's statement of basis and purpose is "fully explanatory of the complete factual *and legal* basis" for the new regulations, S.Rep. No. 248, 79th Cong., 2d Sess. 20 (1946) (emphasis added), including their compliance with the no-less protection rule.

### B. *Mandatory Safety and Health Standards*

Initially, then, we face the threshold question of whether and to what extent the roof standards in this case are "mandatory health or safety standards" as that term is used in § 101(a)(9), since only such mandatory standards are included within the "no-less protection" directive of the Act. A brief account of MSHA's regulatory scheme is necessary to answer that question.

MSHA regulates mine operation in two ways. First, it promulgates pursuant to § 101 regulations that establish general and mandatory standards with which all mine operators must comply. Second, it requires mine operators to compile comprehensive plans addressing specific subjects such as roof control and ventilation. 30 U.S.C.A. §§ 862(a) and 863(a). (We are here concerned with the roof control plans.) These plans are then submitted to an MSHA district manager for approval. Once approved, the plans are mandatory in the sense that a violation of the requirements in the plans constitutes a violation of the Act.[7]

The specific contents of any individual mine operation plan are determined through consultation between the mine operator and the district manager. To guide this process, MSHA has promulgated "criteria" which "should" be met in all plans. For example, one roof bolt criterion which was superseded by the new regulations stated: "All components of the roof bolt assembly should comply with the American National Standards Institute, 'Specifications for Roof Bolting Materials in Coal Mines'." 30 C.F.R. § 75.200–7(a)(1) (1986). Plan components may be taken directly from the criteria; alternatively, the mine operator and/or district manager may suggest requirements that do not appear in the criteria. District managers, however, were explicitly prohibited by the old regulations from approving any plan requirements

---

6. Petitioner Union has in fact framed its challenge in a way which calls upon us to agree with its assessment that the regulations reduce protection. We treat their challenge as an attack on the adequacy of the statement of basis and purpose.

7. In an opinion construing the Coal Act of 1969, Pub.L. No. 91–173, 83 Stat. 742 (1969) (revised as Mine Act, 1977), this circuit held that plan requirements are enforceable. *Zeigler Coal Co. v. Kleppe,* 536 F.2d 398 (D.C.Cir.1976). This holding was explicitly approved by Congress when it enacted the revised Mine Act; Congress stated that "[t]he requirements of these plans are enforceable as if they were mandatory standards." S.Rep. No. 95–181, 95th Cong., 1st Sess. 25 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3401, 3425.

which did not provide the same level of protection as the criteria:

> § 75.200–6 Criteria for approval of roof control plans.
>
> Sections 75.200–7 through 75.200–14 set out the criteria by which District Managers will be guided in approving roof control plans on a mine-by-mine basis. Additional measures may be required. Roof control plans which do not conform to these criteria may be approved providing the operator can satisfy the District Manager that the resultant roof conditions will provide no less than the same measure of protection to the miners.

30 C.F.R. § 75.200–6 (1986). Individual plans could, therefore, incorporate requirements to supplement or supplant standards set out in the criteria, but these alternative requirements had to protect miners at least as much as the criteria standards.

Prior to the new rules under review, a roof control plan usually included both a core of generally-applicable protections (derived from either the criteria regulations or MSHA policy), and other mine-specific standards designed to address particularized safety and health concerns in the individual mine. One of the stated objectives of the new rulemaking was to simplify these roof plans by putting the more generally-applicable standards into universal mandatory standard form, thereby allowing the plans to focus on predominantly mine-specific requirements. *Roof Support Standards*, 53 Fed.Reg. 2,354 (1988) (final rule).

Against this background, we now turn to the critical question of whether the pre-existing regulations, establishing a scheme in which roof control plans were approved by MSHA according to a set of criteria, amounted to a "mandatory" standard, as that term is used in § 101(a)(9), so as to invoke the no-less protection rule. The question raises some rather intricate issues of statutory interpretation.

First, the term "mandatory health or safety standards" is defined in the Act as "the interim mandatory health or safety standards established by subchapters II and III of this chapter, and the standards promulgated pursuant to subchapter I of this chapter." 30 U.S.C.A. § 802(*l* ). "Subchapter I of this chapter" contains, in § 101, the basic grant of authority to the Secretary to promulgate such standards:

> The Secretary shall by rule in accordance with procedures set forth in this section and in accordance with section 553 of Title 5 ... develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines.

30 U.S.C.A. § 811(a). The only other source of rulemaking authority appears in subchapter V of the Act, § 508: "The Secretary ... [is] authorized to issue such regulations as [she] deems appropriate to carry out any provision of this chapter." 30 U.S.C.A. § 957. Regulations promulgated pursuant to § 508 alone do not establish "mandatory health or safety standards" for the purposes of § 101(a)(9)'s no-less protection rule.[8]

Since MSHA did not specifically identify the source of the roof plan regulations, *see Mandatory Safety Standards, Underground Coal Mines*, 35 Fed.Reg. 17,890, 17,893 (1970),[9] we must rely on the traditional tools of statutory construction to determine whether these regulations fall within the statutory definition of "mandatory standards." We find that they clearly do.

Congress itself established the basic requirement that mine operators adopt approved roof control plans as an interim mandatory standard in the Mine Act:

> Each operator shall undertake to carry out on a continuing basis a program to improve the roof control of each coal mine and the means and measures to

8. Of course, the Secretary can nonetheless enforce compliance with § 508 regulations. 30 U.S.C.A. § 814(a) (1986).

9. The single statement of authority for all regulations pertaining to roof support (Part 75 of Title 30 in the Code of Federal Regulations) cited to both § 508 and § 301 of the 1969 Act. § 301 grants the Secretary authority to replace Congress' interim standards with improved standards promulgated under § 101.

accomplish such system. The roof and ribs of all active underground roadways, travelways, and working places shall be supported or otherwise controlled adequately to protect persons from falls of the roof or ribs. A roof control plan and revisions thereof suitable to the roof conditions and mining system of each coal mine and approved by the Secretary shall be adopted and set out in printed form within sixty days after the operative date of this subchapter.

30 U.S.C.A. § 862(a). The statutory standard obviously did not specify all of the requirements that had to be included in the plan. Congress established a limited number of explicit requirements for roof support, such as the requirement that adequate supplies of roof support materials be provided in all working areas of the mine, 30 U.S.C.A. § 862(c), and that safety inspections be conducted prior to the commencement of any work, 30 U.S.C.A. § 862(f). But the vast bulk of requirements for achieving a roof control plan "suitable to the roof conditions and mining system of each coal mine" were left to be developed by the mine operator and MSHA.[10] In particular, Congress left essentially all the standards for roof bolts and roof support removal to be developed exclusively through the roof plan approval process. *See* 30 U.S.C.A. §§ 862(d) and (e) (1986). MSHA predictably implemented the statutory interim standard by promulgating criteria to guide plan approval by its district managers. District managers were prohibited under these implementing regulations from approving any plan covering roof bolts or support removal which failed to afford as much protection to miners as the criteria did.

Congress explicitly stated its reasons for relying on mandatory roof control plans in the 1977 Mine Act: "Such individually tai-

lored plans, with a nucleus of commonly accepted practices, are the best method of regulating such complex and potentially multifaceted problems as ventilation, roof control and the like." S.Rep. No. 95–181, 95th Cong., 1st Sess. 25 (1977), U.S.Code Cong. & Admin.News 1977, p. 3425. Congress obviously intended these roof control plans to afford comprehensive protection against roof collapse—the "leading cause of injuries and death in underground coal mines," *Roof Support Standards*, 53 Fed. Reg. 2,354 (1988). Indeed, these plans were intended to be more comprehensive than uniform mandatory standards because in addition to a *"nucleus," id.*, of practices that are necessary to prevent roof collapse in *any* mine, they were to include whatever unique measures were necessary to address the unique attributes of a *particular* mine. This is undoubtedly the virtue that Congress saw in requiring comprehensive individually tailored roof control plans.

In this respect we point out our disagreement with intervenor American Mining Congress' ("AMC") argument that these roof control plans were intended to contain only provisions tailored to mine-specific conditions. AMC argues that roof control plans could legitimately be used to impose *only* "those requirements necessary to address unique conditions peculiar to each mine." Brief for Intervenor at 6. As a consequence, AMC argues that "any coerced incorporation of [the] nationally applicable criteria [found in MSHA's roof support regulations] was itself a violation of the Mine Act," *id.* at 12, n. 8, any generally-applicable criteria were not legitimate components of the approved roof control plan required by the mandatory standard and so the no-less protection rule does not require that the new regulations be as protective as the old criteria.[11]

**10.** We note that while the mine operator had a role to play in developing plan contents, MSHA always retained final responsibility for deciding what had to be included in the plan. In 1977 Congress "caution[ed] that while the operator proposes a plan and is entitled, as are the miners and representatives of miners to further consultation with the Secretary over revisions, the Secretary must independently exercise his

judgment with respect to the content of such plans in connection with his final approval of the plan." S.Rep. No. 95–181, 95th Cong., 1st Sess. 25 (1977), U.S.Code Cong. & Admin.News 1977, p. 3425.

**11.** The Secretary does not herself squarely address this issue. In her brief to the court (although not in her statement of basis and purpose), she did discuss the comparative protec-

Nothing in the original interim standard established by Congress suggests that the plan was to be confined exclusively to mine-specific conditions. As we have already emphasized, Congress relied almost entirely on the roof control plan to protect miners from the most common cause of fatalities. AMC's position would drastically undercut the rationale of such an approach and invite the curious paradox that any protective measure identified by the Secretary as of common value in *most* mines could not be imposed in *any* mine plan. It would border on the irrational for Congress to have established these plans as the interim exclusive method of regulating roof support and then to have so limited the Secretary's authority to insure their effectiveness.

The criteria that the Secretary promulgated to guide the approval of roof control plans identified measures which MSHA deemed necessary to achieve safety goals in many or most mines; the regulations however recognized that these measures might be inappropriate or subject to substitution under certain mine conditions. That fact alone does not support AMC's contention that those criteria were wholly "advisory" [12] and that it was therefore "illegal" for the Secretary to at times refuse to approve a plan until the operator incorporated particular criteria.

While mine operators were not *per se* required to comply with each and every criterion so that the criteria were not themselves mandatory standards, if the criteria were actually incorporated into an approved plan, the operator was bound to comply with them. Plans, on the other hand, could be approved by MSHA *only if* they either conformed to the criteria or "provide[d] no less than the same measure of protection to the miners" as the criteria. 30 C.F.R. § 75–200–6 (1986). Therefore, if MSHA disagreed that a mine operator's alternative "mine-specific" measure protected as well as a generally-applicable criterion, MSHA was not only empowered but *required* to withhold approval of the plan until the mine operator incorporated the criterion.[13] Thus the criteria regulations implementing the Act's mandatory interim roof control plan standard themselves constituted a mandatory standard laying down a required level of protection for miners that had to be met by all plans.

To be sure, the Secretary may, as she has in fact done here, promulgate generally-applicable requirements on roof control as explicit mandatory standards under § 101, thereby changing the focus of the roof control plan from establishing comprehensive protection to providing a supplementary set of regulations for individual mines. We do not agree with AMC, however, that the Secretary was, immediately upon passage of the Act, required to pursue the § 101 notice and comment route for all generally-applicable mandatory standards and was prohibited from setting any general criteria as mandatory standards for approval of mine operators' plans pending adoption of particularized mandatory

---

tion of the new regime and the old but she did not identify the mandatory standard that she believed triggered the no-less protection rule. She also asserted that the new regime protected miners better than the old because "the former regulations were advisory rather than mandatory." Brief for Respondent at 11. *See also Roof Support Standards,* 53 Fed.Reg. at 2,371 (former regulations in the nature of "criteria *as opposed to* standards") (emphasis added). We reject this justification because, as we explain *infra* at n. 12, Congress did not empower the Secretary to regulate by advisory standards and the criteria clearly did establish a mandatory level of protection that mine operators had to achieve in their roof control plans.

**12.** The Secretary is not empowered to regulate by advisory standards. Congress was absolutely

clear on this point: "All health and safety standards contemplated by S. 717 are to be mandatory standards. The bill uses the phrase 'mandatory health or safety standard' because this is a defined term under the Coal Act and this bill. The use of the term 'mandatory standard' should not be interpreted to mean that there also will be non-mandatory standards." S.Rep. No. 95–181, *supra,* at 23, U.S.Code Cong. & Admin.News 1977, p. 3423.

**13.** Both mine operators and miner representatives were granted the right to judicial review of the district manager's approval of a plan. 30 U.S.C.A. § 811(d); *see* S.Rep. No. 95–181, *supra,* at 25, U.S.Code Cong. & Admin.News 1977, p. 3425 (judicial review of plan content available under section of act granting review of mandatory standards).

standards.[14]  In advancing such a position, we believe, AMC has misconstrued the implication of an earlier opinion of this court and a more recent decision of the Federal Mine Safety and Health Review Commission ("FMSHRC" or "Commission", the adjudicatory body responsible for hearing appeals from MSHA orders and decisions).

In *Zeigler Coal Co. v. Kleppe*, 536 F.2d 398 (D.C.Cir.1976), we held that violations of requirements in ventilation plans that were not themselves promulgated as mandatory standards nevertheless were enforceable as such under the 1969 Coal Act, which "require[d] violation of a mandatory health or safety standard to bring [relevant enforcement provisions] into play." 536 F.2d at 403.[15]  We stated that the term " 'mandatory standard' can reasonably be read to include provisions of plans whose adoption is explicitly required under an existing mandatory standard." *Id.* at 409. In the course of reaching this conclusion, the court addressed the concern that if the Secretary was authorized to incorporate general requirements into mine plans and enforce them as mandatory standards, she might thereby circumvent the Act's requirement that mandatory standards be promulgated pursuant to § 101's notice and comment procedures.[16]  The court met this concern by observing that "the plan idea was conceived for a quite narrow and specific purpose," *id.* at 407, and noting that

> an operator might contest an action seeking to compel adoption of a plan, on the ground that it contained terms relating not to the particular circumstances of his mine, but rather imposed requirements of a general nature which should more properly have been formulated as a mandatory standard, under the provisions of

§ 101. This would appear to render all but inconsequential the actual circumvention of § 101 resulting from the enforceability of ventilation plans. For insofar as those plans are limited to conditions and requirements made necessary by peculiar circumstances of individual mines, they will not infringe on subject matter which could have been readily dealt with in mandatory standards of universal application.

*Id.* We read this caution in *Zeigler* to say only that the Secretary could abuse her discretion by utilizing plans rather than explicit mandatory standards to impose general requirements if by so doing she circumvented procedural requirements for establishing mandatory standards laid down in the Mine Act. *Zeigler* did not purport to ignore the considerable authority of the Secretary to determine what "should more properly have been formulated as a mandatory standard under the provisions of § 101," *id.*, and to determine what is "subject matter which could have been readily dealt with in mandatory standards of universal application," *id.*

In this case the roof plan approval criteria were promulgated according to notice and comment procedures to supplement the Act's mandatory interim standard that mine operators adopt an approved roof control plan. The level of miner protection provided by each plan, moreover, was calibrated to the criteria themselves, although they were not required to be implemented in each plan. The Secretary conducted the rulemaking under review precisely because she had made the determination that many of the criteria were the proper subject of separate mandatory standards.[17]  Her re-

---

14. We note that when Congress established the interim standards it required the adoption of a roof control plan within sixty days of the effective date of the statute. 30 U.S.C.A. § 862(a). Congress could hardly have expected the Secretary to put any uniform standards necessary to prevent roof falls into explicit mandatory standards within that short a time frame.

15. The 1977 Mine Act explicitly authorized enforcement of not only "mandatory standards" but any violation of "this chapter or ... rule, order or regulation promulgated pursuant to this chapter." 30 U.S.C.A. § 814(a).

16. We note that the plan provision at issue in *Zeigler* was not itself a criterion appearing in the plan regulations.

17. Perhaps the AMC's argument would be entitled to some weight if the Secretary had delayed too long in making this determination, *cf. Oil, Chemical and Atomic Workers International Union v. Zegeer*, 768 F.2d 1480 (D.C.Cir.1985) (MSHA delay in promulgating standards reviewable), although even then the case would be a hard one to make given the inherent deference the court affords to an agency's decisions about when to institute proceedings, *cf. Heckler v.*

cent action in this regard, however, does not constitute evidence that she abused her authority in failing to do so earlier or that she was in any way acting "illegally" in requiring that generally-applicable plan approval criteria or their equivalents be incorporated into mine plans.

The FMSHRC decision in *Carbon County Coal Corp.*, 1984–1985 O.S.H. (CCH) ¶ 27,385 (1985), is consistent with our interpretation of *Zeigler*. *Carbon County* involved a mine operator who proposed an alternative to a procedure (again not a criterion in the regulations) that the MSHA district manager had suggested be included in a ventilation plan. The district manager refused to allow the alternative and an administrative law judge upheld this decision. The Commission reversed on the ground that the district manager's rejection of Carbon County's alternative procedure "was the result of a rote application" of the MSHA guideline. *Id.* at 35,466. (The district manager had refused even to consider the alternative and to determine whether it was equivalent to the guideline in light of the particular conditions of Carbon County's mine.)

We read *Carbon County* to make the narrow point that mine operators are entitled to have alternative procedures evaluated by the district manager to determine if they achieve the safety objectives set out in MSHA regulations and policy; the Commission there "conclude[d] that the uncontroverted material facts establishe[d] that MSHA's decision to impose the [disputed] provision was not based upon particular circumstances at the Carbon No. 1 Mine, but rather was imposed as a general rule applicable to all mines," and that as a consequence MSHA's insistence on the provision was "not in accord with applicable Mine Act procedure." *Id.* at 35,467. Citing *Zeigler*, the Commission emphasized that

> [t]his does not mean that the [ ] provision may not be applied at the Carbon No. 1 Mine. If negotiations on the ventilation

plan resume, MSHA may determine, and may be able to establish that particular conditions at the mine warrant the inclusion of the [ ] provision in the ventilation plan. Also, if MSHA believes the [ ] provision to be of universal application, the Secretary may proceed to rulemaking under section 101 of the Mine Act and promulgate the [ ] provision as a nationally applicable mandatory safety standard.

*Id.* We decline to read into *Carbon County* anything more than we found in *Zeigler*, *i.e.*, a warning that the Secretary should utilize mandatory standards for requirements of universal application. We reject the AMC's argument that under either decision the Secretary was in a plan precluded from requiring mine operators to incorporate measures necessary to achieve an overall level of miner protection on all pertinent aspects of roof control.

■ Thus we conclude, finally, that MSHA's implementing regulations including criteria for roof plan approval constituted a mandatory standard which required mine operators to adopt roof control plans and prohibited MSHA from approving these plans unless they protected at least as well as did the criteria. The criteria established a mandatory level of protection for the purposes of § 101(a)(9)'s no-less protection rule. Accordingly, the Secretary was required to ensure that the new regulations she promulgated to replace the old criteria provisions did not reduce miner protection.

### III. ROOF BOLT AND SUPPORT REMOVAL REGULATIONS

#### A. *Statement of Basis and Purpose*

■ It is now a fairly simple matter to conclude that the Secretary has failed in this instance to adequately comply with the procedural and substantive requirements of the Mine Act and that her new regulations

---

*Chaney*, 470 U.S. 821, 831–35, 105 S.Ct. 1649, 1655–58, 84 L.Ed.2d 714 (1985) (presumption that decision whether to institute agency proceedings is committed to agency discretion);

*American Horse Protection Association v. Lyng*, 812 F.2d 1, 4–5 (D.C.Cir.1987) (agency's refusal to institute rulemaking accorded high deference).

governing roof bolts and support removal are, consequently, arbitrary and capricious.

The pre-existing regulation on roof bolts was one of the plan-approval criteria for roof control plans. 30 C.F.R. § 75.200–7 (1986). As we have explained, since district managers were not authorized to approve plans which did not provide as much protection as the criterion, 30 C.F.R. § 75.200–6 (1986), the criterion established a mandatory level of protection that the new regulations had to meet or improve upon under the no-less protection rule. The prior regulations governing the removal of roof support were also styled as plan-approval criteria, 30 C.F.R. § 75.200–14 (1986), and again the MSHA district manager was precluded from approving plans providing less protection than the criteria. In addition, in the case of removal of roof bolts (as opposed to other types of support), a specific regulation made the criteria themselves mandatory. 30 C.F.R. § 75.204–1 (1986). Thus the new roof bolt regulations and the new roof support removal regulations replaced existing mandatory standards; the Secretary was therefore required to ensure that the new regulations did not reduce miner protection below the level afforded by that mandatory standard.

The Secretary's statement of basis and purpose, however, is virtually silent on this issue. While she did discuss the general safety features of the new regulations, she did not discuss how protective the old regulations were nor how the new regulations maintain or improve upon this level of protection.[18] Indeed, the complete absense of any discussion of the no-less protection rule and the Secretary's hazy *post hoc* arguments to the court attempting to belatedly supply the necessary justification leave us no alternative but to conclude that the Secretary simply failed to take account of this

statutory limitation on her authority.[19] The statement of basis and purpose is therefore patently inadequate and the rulemaking was arbitrary and capricious with respect to the roof bolt and support removal standards.

### B. *Remedy*

The inadequacy of the Secretary's statement of basis and purpose leaves us with the question of an appropriate remedy. This court has recently set out the remedial options available in a case such as this:

> In fashioning a remedy for an agency's failure to present an adequate statement of basis and purpose, this court may either remand for specific procedures to cure the deficiency without vacating the rule [ ] or it may vacate the rule, thus requiring the agency to initiate another rulemaking proceeding if it would seek to confront the problem anew.

*Independent U.S. Tanker Owners Committee v. Dole,* 809 F.2d 847, 854 (D.C.Cir.), *cert. denied sub nom. Atlantic Richfield Co. v. Independent U.S. Tanker Owners Committee,* —— U.S. ——, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987). In choosing the appropriate course of action, we consider both the seriousness of the deficiencies in the completed rulemaking and the doubts the deficiencies raise about whether the agency chose properly from the various alternatives open to it in light of statutory objectives. *Id.* at 855.

Our review of the rulemaking record suggests that the deficiencies in the rulemaking were fundamental and may well have affected the Secretary's choices. This is not a case in which the court is easily able to find a lawful basis for the regulations but unable to uphold the regulations because the agency itself has rested on other, unreasonable, grounds. *Cf. Nation-*

---

**18.** The Secretary's one or two passing references to the old regulations do not, in our view, amount to a discussion of comparative protection as contemplated by the no-less protection rule. *See e.g., Roof Support Standards,* 53 Fed. Reg. at 2,367.

**19.** This conclusion is further reinforced by the fact that a number of the Union's arguments about how the new regulations reduce protec-

tion appear, at least on the surface, reasonable. This suggests to us that the Secretary, believing that her duty was merely to establish "safe" standards and not standards achieving a particular level of safety, did not explore the merits of these arguments. We emphasize that the statutory standard is an unusual but nonetheless strict one.

*al Nutritional Foods Association v. Weinberger,* 512 F.2d 688, 703 (2d Cir.), *cert. denied sub nom. National Nutritional Foods Association v. Mathews,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975) (remand and not vacatur of regulations appropriate where indications are that agency made rational choice but failed to fully include rationale in record).

We are inclined to the view that, due to her past misinterpretation that the plan-approval criteria did not establish any mandatory level of protection for § 101(a)(9)'s purposes,[20] the appropriate remedy here is to require the Secretary to initiate a new rulemaking or minimally to reopen the old record for further evidence and comment on the no-less protection requirement. Burdened by the view that the criteria regulations were advisory, MSHA neither explored for itself nor elicited comments from all interested parties focused on the comparative level of protection afforded miners under the old and new regulations. The Secretary's arguments to the court and the complete absence of any discussion of the no-less protection rule in her statement of basis and purpose suggests strongly, as we have noted, that she did not conduct the rulemaking with this constraint on her authority in mind. A new or reopened rulemaking seems the only way to effectuate the intent of Congress in § 101(a)(9) to maintain, if not improve, the safety of underground mining.

In order to minimize disruption to the mining industry[21], however, we are requesting supplementary briefs on the most appropriate form of relief in this case, *i.e.,* whether the existing regulations should be vacated pending action by the Secretary in compliance with our opinion or whether they should remain in place until the Secretary has acted within a reasonable time to correct the deficiencies in the original proceedings. Our mandate will accordingly issue at a later date when we have had the benefit of supplementary briefing.

### IV. LONGWALL MINING

We turn now to the Union's remaining challenge to MSHA's new regulations on longwall mining which provide as follows:

For each longwall mining section, the roof control plan shall specify—

(a) The methods that will be used to maintain a safe travelway through the tailgate side of the longwall; and

(b) The procedures that will be followed if a ground failure prevents travel out of the section through the tailgate side of the longwall.

30 C.F.R. § 75.215 (1988). Additional regulations set out in greater detail the criteria which will govern plan approval in this regard; "[r]oof control plans that do not conform to the applicable criteria ... may be approved by the District Manager, provided that effective control of roof, face and ribs can be maintained."[22] 30 C.F.R. § 75.222(a) (1988). In particular, the criteria suggest that supplemental support be installed throughout the tailgate entry and that emergency procedures such as reinstruction of miners in the use and availability of escapeways and self-rescue devices, be put into effect if ground failure prevents travel through the tailgate; these procedures should be required to remain in effect until the travelway is reestablished. 30 C.F.R. § 75.222(g) (1988).

Unlike the challenges to the roof bolt and support removal regulations, we find no error in the Secretary's promulgation of these new standards to address the roof support concerns raised by longwall mining. To begin with, the standard of review here is quite different: the new longwall mining regulations do not replace

---

**20.** *See* n. 11, *supra.*

**21.** As a consequence of the new regulations, current mining plans in all likelihood contain *no provisions on roof bolts or roof support removal;* vacating the regulations will therefore require modification of many if not all plans.

**22.** We note that under the new regulations for plan approval, district managers are no longer specifically required to ensure that a mine operator's plan protects at least as much as a plan conforming to the criteria. The new mandatory standard is that the district manager ensure that plans not conforming to the criteria provide for "effective" roof control. We intimate no view as to the meaning of the term "effective."

existing standards so that the constraints of § 101(a)(9) do not come into play. We therefore review the new regulations only to ensure that they are not arbitrary or capricious or otherwise not in accordance with law. 5 U.S.C. § 706 (1977).

*A. Background*

To put the debate over the new longwall mining regulations in perspective, we begin with a brief description of the nature of "two-entry" longwall mining. In this type of mining, two parallel tunnels (entries) are created. At the end of these entries another tunnel is established perpendicularly to join the two parallel tunnels, thus creating three sides of a rectangle called a longwall section. The joining tunnel, the longwall itself, exposes the face of rock from which coal will be extracted by a shearer moving back and forth across the face. The longwall is progressively mined so that the longwall advances towards the start of the two parallel entries and the sides of the rectangle shorten. The two parallel entries are called the headgate entry and the tailgate entry. Coal extracted from the face of the longwall is normally carried out of the mine on conveyors which travel through the headgate entry.

Other tunnels or entries may connect with the longwall section. For example, there may be other entries on the tailgate side (that is, next to the tailgate entry but outside the three-sided rectangle formed by the headgate, tailgate and longwall) which are themselves connected to the longwall by other tunnels. There may also be other entries which go deeper into the mine in the mined-out area behind the longwall.

Obvious dangers arise for miners working on the longwall from the possibility that their ventilation and escape may be restricted because of the limited number of entries. (Entries serve not only as potential escape routes but also as "aircourses" through which fresh air reaches the miners.) These dangers are heightened by the risk of fire arising from the operation of equipment located in the headgate entry. If such a fire occurs, escape on the headgate side of the longwall may become im-

possible because of heat and smoke. Hence the understandable concern about the feasibility of escape and ventilation through the tailgate side.

Two reports commissioned by MSHA have emphasized the importance of maintaining escape routes on the tailgate side of the longwall. Indeed, MSHA's Task Force on Longwall Mining specifically recommended that "a safe travelway, under supported roof through tailgate entries or bleeders to a mine exit, be provided off the face on the tailgate side for emergency purposes at all times while personnel are present." J.A. 240. And MSHA's investigative report on a 1985 disaster at the Wilberg Mine in Orangeville, Utah, in which 27 miners died after a fire blocked the headgate, also stressed the dangers of inadequate escapeways on the tailgate side. *See* J.A. 343.

*B. Conflict with Statute*

The Union first contends that the new longwall regulations are unlawful because they conflict with an existing regulation. This regulation, drawn directly from the interim standards established in the Act, provides in relevant part:

[E]xaminations for hazardous conditions, including tests for methane, and for compliance with the mandatory health or safety standards, shall be made at least once each week by a certified person designated by the operator in ... at least one entry of each intake and return aircourse *in its entirety.* ... [I]f any hazardous condition is found, such condition shall be reported to the operator promptly. Any hazardous condition shall be corrected immediately. If such condition creates an imminent danger, the operator shall withdraw all persons from the area affected by such condition to a safe area ... until such danger is abated.

30 C.F.R. § 75.305 (1988); 30 U.S.C.A. § 863(f) (interim standard) (emphasis added).

Relying on the language highlighted, *supra,* the Union argues that this weekly examination regulation requires that tailgate entries (which are either "intake or

return aircourses," 53 Fed.Reg. at 2,369) be travelable at all times and that should the tailgate become blocked, mining must cease in the longwall section until the blockage is cleared. It contends that the new longwall mining regulations violate a cessation-of-mining requirement in the weekly examination rule: the Union reads the new regulations to allow mining to continue despite a blockage in the tailgate entry because they provide for emergency procedures to be put into effect when a blockage occurs and to continue throughout the duration of the blockage.

The complaint is oddly framed. The weekly examination regulation is still in effect. Whatever it requires in terms of maintaining travel through the tailgate is still required. The new regulations merely supplement that regulation with details on emergency procedures to be followed once a blockage in the tailgate is discovered.

Admittedly, the precise effect of the weekly examination regulation is somewhat ambiguous, and MSHA has not provided us with a definitive interpretation of how it is being implemented. As we read the regulation, however, it requires that the tailgate entry be capable of travel each week in order to test for hazardous conditions.[23] What the mine operator is required to do once an examination reveals a blockage or other "hazardous condition" also seems clear enough: "Any hazardous condition shall be corrected immediately. If such condition creates an imminent danger, the operator shall withdraw all persons from the area affected by such condition to a safe area ... until such danger is abated." 30 C.F.R. § 75.305 (1988). We cannot find, nor has the Union shown us, in this language any requirement that mining stop whenever any blockage is discovered. Only if the blockage poses an "imminent danger" must miners be withdrawn from the area. MSHA's new regulations appear

only to supplement that requirement by stating that while correction of *any* tailgate blockage is underway, certain emergency precautions will be in effect.

Were MSHA urging the court to accept an interpretation of the new regulations which did not require "immediate correction" of any hazardous condition or withdrawal of miners in the face of "imminent danger" created by a blockage of the tailgate, the Union would be on stronger ground. We do not, however, understand MSHA to be urging any such interpretation and consequently we reject the Union's challenge that the new regulations are inconsistent with the weekly examination regulation.

### C. *"Arbitrary and Capricious" Challenge*

▮ The Union's contention that the new longwall mining regulations are arbitrary and capricious must also fail. Essentially the Union argues that because MSHA's reports on Two–Entry Longwall Mining and the Wilberg Mine Disaster conclude that it is critical to miner safety to keep open routes out of the mine on the tailgate side of the longwall, it is unreasonable for MSHA to promulgate regulations which assume mining will continue despite blockage.

But the longwall regulations challenged here are only part of the total regulatory regime for longwall mining: they pertain to "Roof Support."[24] The regulations on roof support are not the only nor even the most likely vehicle for addressing the Union's legitimate concerns about the dangers of escaping from longwall sections when tailgate entries are blocked. Indeed, other portions of MSHA's regulations address these concerns directly. In addition to the continuing requirement that tailgate entries be traveled weekly, and that hazardous conditions be corrected immediately, 30

---

**23.** In the report on the Wilberg mine disaster, MSHA did interpret the examination regulation to require travel in the tailgate unless an alternative procedure has been approved through the statute's petition for modification process, 30 U.S.C.A. § 811(c) (allowing relief from otherwise mandatory standards). *See* J.A. 343.

**24.** The rulemaking we are reviewing was explicitly addressed to that part of the regulations set out in Title 30 of the Code of Federal Regulations which pertains to roof support: Subpart C of Part 75.

C.F.R. § 75.305 (1988), the regulations (again adopting an interim standard established by Congress) require that mine operators maintain two travelable escapeways at all times. 30 C.F.R. § 75.1704 (1988); 30 U.S.C.A. § 877(f)(1) (interim standard). Thus mine operators are still required to shut down mining on the longwall section if the tailgate becomes blocked and as a result there is only one remaining escapeway from the section.

The Union's concern, echoed in MSHA's task force report, is that the requirement of two escapeways is inadequate to protect miners because if both escapeways are on the headgate side, a fire in the headgate would make them both impassable, thereby trapping miners in the longwall section. MSHA is, however, addressing this problem in ongoing rulemaking to revise those portions of its regulations that directly address ventilation and escape standards. For example, the following regulations have been proposed by MSHA:

§ 75.383 Shortwall and Longwall Travelways

When shortwall or longwall systems of mining are used, and the two designated escapeways ... are located on one side of the block of coal being mined, a travelway shall be provided on the other side of that block of coal. The travelway shall be located to follow the most direct and safe practical route to a designated escapeway, and the route of travel shall be clearly marked if more than one entry is used to provide the travelway.

§ 75.364 Weekly Examinations

(c) *Hazardous Conditions.* At least every seven days, an examination for hazardous conditions, including air velocity measurements and tests for methane, shall be made by a certified person designated by the operator at the following locations:

.    .    .    .    .

(3) In at least one air course in its entirety on the tailgate side of each longwall mining section, so that the entire air course is traveled.

*Safety Standards for Underground Coal Mine Ventilation,* 53 Fed.Reg. 2,382, 2,423 and 2,420 (1988) (proposed rule). These proposed regulations indicate that MSHA is simultaneously addressing escape and ventilation concerns in areas distinct from the roof support regulations. MSHA is entitled to administer the Mine Act by addressing different parts of its safety problems in different regulations; the agency need not adopt, nor explain its rejection of, *all* task force recommendations on the subject whenever it promulgates regulations pertaining to one aspect of overall safety. We therefore find the new longwall regulations to be neither arbitrary nor capricious.

V. CONCLUSION

We conclude that the new regulations on longwall mining, 30 C.F.R. 75.215 and 30 C.F.R. 75.222 (1988), neither contravene existing regulations nor evidence arbitrary or capricious agency action. We uphold these regulations as valid.

We also conclude that, because the pre-existing plan-approval criteria established a mandatory level of protection for the purposes of 30 U.S.C.A. § 811(a)(9), new regulations on roof bolts and support removal must not reduce miner protection below that level. The Secretary's required statement of basis and purpose does not explain how the new regulations comport with this strict statutory limitation on her rulemaking authority; the Union has raised serious questions suggesting that her failure to provide an explanation stemmed from a failure to consider the constraints of the no-less protection rule during the rulemaking. We therefore find the new regulations on roof bolts and roof support removal invalid and order supplemental briefing on the issue of whether the court should vacate the new regulations pending further proceedings by the Secretary consistent with this opinion.

SO ORDERED.