# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 13, 2007          Decided January 11, 2008

No. 07-1026

NATIONAL MINING ASSOCIATION,
PETITIONER

v.

MINE SAFETY AND HEALTH ADMINISTRATION AND
SECRETARY OF LABOR,
RESPONDENTS

UNITED MINE WORKERS OF AMERICA,
INTERVENOR

On Petition for Review of a Final Rule of the
Federal Mine Safety and Health Administration

*Daniel W. Wolff* argued the cause for petitioner. With him on the briefs were *Thomas C. Means*, *Edward M. Green*, and *Harold P. Quinn, Jr.*

*Jerald S. Feingold*, Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief was *W. Christian Schumann*, Counsel, Mine Safety & Health Administration. *Jack Powasnik*, Counsel, entered an appearance.

*Judith Rivlin* and *Grant Crandall* were on the brief for intervenor.

Before: SENTELLE, RANDOLPH and KAVANAUGH, *Circuit Judges*.

RANDOLPH, *Circuit Judge*: Two fatal accidents at West Virginia coal mines in January 2006 prompted the Mine Safety and Health Administration – MSHA – to adopt emergency safety measures. *See* 71 Fed. Reg. 12,252 (Mar. 9, 2006). MSHA, an agency within the Department of Labor, concluded that the West Virginia miners might have survived if there had been portable oxygen devices[1] in the escapeways to protect them from toxic fumes for at least an hour. Acting quickly, MSHA issued an emergency temporary standard requiring mine operators to place such rescue devices, one for each miner, in the primary and emergency escapeways of the mine.[2] This

---

[1]These devices, known as self-contained self-rescuers, are "closed-circuit breathing apparatus[es]." 64 Fed. Reg. 36,632 (Jul. 7, 1999). They operate by feeding fresh oxygen from a reserve tank on the miner's back into a breathing bag which is attached to an inhalation tube and mouthpiece allowing the miner to inhale clean oxygen. *Instruction Manual for OCENCO, Inc. EBA 6.5 60 Minute Self-Contained Self-Rescuer* 4 (Sept. 7, 2001), http://www.msha. gov/interactivetraining/scsr/ocenco%20eba%2065/lesson05/ocen co%20eba%2065%20manual.pdf. The miner exhales through the mouthpiece. The exhaled air is scrubbed to remove $CO_2$ and then returned to the breathing bag to be mixed with more fresh oxygen. *Id*. The closed-circuit nature of these devices prevents toxins present in the mine from being inhaled by the miner.

[2]This requirement kicked in only if the rescue devices located in the working areas of the mine would be insufficient to permit the average miner to escape from the mine within thirty minutes. That limitation, still present in the final rule, 30 C.F.R. § 75.1714-4(c)

petition for judicial review, brought by the National Mining Association, seeks to set aside the final rule that replaced the temporary standard.

The Mine Act authorizes MSHA to issue the temporary rules without notice and comment in response to emergencies. 30 U.S.C. § 811(b)(1). In this case, in order to make its temporary standard permanent, MSHA engaged in notice-and-comment rulemaking, with the published temporary standard serving as the proposed rule. 30 U.S.C. § 811(b)(3). The resulting product – the final emergency mine evacuation rule, 71 Fed. Reg. 71,430 (Dec. 8, 2006) – altered the temporary standard with respect to rescue devices. *See* 30 C.F.R. § 75.1714-4 (2006). The final rule required either that one additional device be provided for each miner in each emergency escapeway or that one additional device be provided in a "hardened room" cache located between two adjacent emergency escapeways and accessible from both. *Id.* § 75.1714-4(d). A "hardened room" is a reinforced room built to the "same explosion force criteria as seals" and serviced by an independent, positive pressure source of ventilation from the surface. *Id.* § 75.1714-4(d)(1).

## I.

The National Mining Association urges us to set the final rule aside. One of its objections is that MSHA failed to give adequate notice of the hardened room option. The objection rests on § 101(a)(2) of the Mine Act. 30 U.S.C. § 811(a)(2). This section requires MSHA, in putting out proposed rules for notice and comment, to publish "the text of such rules proposed

---

(2006), is not important to our analysis.

in their entirety" in the Federal Register. *Id.*[3] Because MSHA never published the hardened room option in the Federal Register before issuing the final rule, National Mining concludes that this aspect of the final rule is invalid.

That the final rule differed from the one MSHA proposed is hardly unusual. An agency's final rules are frequently different from the ones it published as proposals. The reason is obvious. Agencies often "adjust or abandon their proposals in light of public comments or internal agency reconsideration." *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994). Whether in such instances the agency should have issued additional notice and received additional comment on the revised proposal "depends, according to our precedent, on whether the final rule is a 'logical outgrowth' of the proposed rule." *Id.*; *see United Mine Workers of Am. v. MSHA*, 407 F.3d 1250, 1259-60 (D.C. Cir. 2005). While we often apply the doctrine simply by comparing the final rule to the one proposed, we have also taken into account the comments, statements and proposals made during the notice-and-comment period. *See Natural Res. Def. Council v. Thomas*, 838 F.2d 1224, 1243 (D.C. Cir. 1988); *Edison Elec. Inst. v. OSHA*, 849 F.2d 611, 621 (D.C. Cir. 1988); *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1221 (D.C. Cir. 1980); *District of Columbia v. Train*, 521 F.2d 971, 997 (D.C. Cir. 1975). In *South Terminal Corp. v. EPA*, the case that gave birth to the "logical outgrowth" formulation, the court did the same. 504 F.2d 646, 659 (1st Cir.

---

[3]In this respect § 101(a)(2) is more confining than the Administrative Procedure Act, which allows agencies to give notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). Even so, today "most agencies publish the text of the proposed rule when commencing rulemaking." Jeffrey S. Lubbers, *A Guide to Federal Agency Rulemaking* 183 (3d ed. 1998).

1974). The court held that the final rule was "a logical outgrowth" – not simply of the proposed rule – but "of the hearing and related procedures" during the notice and comment period. *Id.*

Here MSHA's proposed rule – the emergency temporary standard – required that a rescue device be provided for each miner in both the primary and the alternative escapeways. That proposal left open several questions. Where in the escapeways should the devices be stored? How should they be made available to the miners? When the two escapeways are close together, will it suffice to have one common cache of devices rather than two separate caches? Given these considerations, interested persons must have been alerted to the possibility of a hardened room option. And the record shows that they were so alerted. Mine operators inquired about the potential of using a common cache of rescue devices located between adjacent emergency escapeways. They submitted questions to MSHA about whether such a common cache would suffice. Four public meetings were held as part of the rulemaking. At each, the MSHA official's opening statement addressed the possibility of a hardened room alternative directly and sought comments from interested parties. A representative of the National Mining Association attended the Washington, D.C., meeting and indicated that his organization would respond to the opening statement by the end of the comment period. The Mining Association never submitted comments, but several interested parties did – including several of the Mining Association's members. MSHA later extended the comment period by thirty days so that "interested parties could adequately address issues contained in MSHA's opening statements." 71 Fed. Reg. 29,785 (May 24, 2006).

The hardened room option was thus a logical outgrowth of the proposed rule, or put differently, the Mining Association had

adequate notice. Even if we were less than certain about this conclusion, the actual notice the Mining Association received would have cured any inadequacy. *See* 5 U.S.C. § 553(b); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983); *Sierra Club v. Costle*, 657 F.2d 298, 355, 360, 398-99 (D.C. Cir. 1981); *Owensboro on the Air, Inc. v. United States*, 262 F.2d 702, 707-08 (D.C. Cir. 1958); Phillip M. Kannan, *The Logical Outgrowth Doctrine in Rulemaking*, 48 ADMIN. L. REV. 213, 221 (1996).

## II.

Between the time MSHA issued its temporary standard and the time it promulgated its final rule, the Mine Improvement and New Emergency Response Act of 2006, Pub. L. No. 109-236, 120 Stat. 493 (2006) (MINER Act), became law. The Mining Association claims that the MINER Act precluded MSHA from promulgating the hardened room option. It is unnecessary to recite in detail the Association's arguments.[4] It raised none of them before MSHA, although it had ample opportunity to do so between the time Congress passed the MINER Act in June 2006 and December 2006 when MSHA issued the final rule. In common with many regulatory statutes, the Mine Act states that "no objection that has not been urged before the Secretary shall be considered by the court, unless the failure or neglect to urge such an objection shall be excused for good cause shown." 30 U.S.C. § 811(d). The Mining Association contends that the comments of several other parties mentioning the MINER Act preserved its objections. We think not. None of those comments came close to setting forth with any specificity the objections the Mining Association now makes regarding the

---

[4]Its statutory interpretation relies on a Senate Committee Report published six months *after* the passage of the MINER Act. S. Rep. No. 109-365 (2006).

MINER Act. *See Nat'l Mining Ass'n. v. MSHA*, 116 F.3d 520, 532 (D.C. Cir. 1997). We therefore will not consider the Mining Association's arguments about the impact of the MINER Act on MSHA's final rule.

## III.

The Mining Association alleges that the hardened room option – as opposed to an option allowing a common cache with less stringent safeguards – is arbitrary and capricious because MSHA did not sufficiently explain its decision.

The Mine Act incorporates the rulemaking requirements of the APA. 30 U.S.C. § 811(a); *United Mine Workers of Am. v. Dole*, 870 F.2d 662, 666 (D.C. Cir. 1989). Under the APA, an agency must "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). This requirement is not meant to be particularly onerous. *See Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). It is enough if the agency's statement identifies the major policy issues raised in the rulemaking and coherently explains why the agency resolved the issues as it did. *See U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 460 (D.C. Cir. 2000); *United Mine Workers of Am. v. Dole*, 870 F.2d at 666; *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 852 (D.C. Cir. 1987). MSHA's statement did just that.

As to the hardened room option, the main controversy was about whether less stringent common storage measures could be used instead.[5] The claim was that these less stringent

---

[5]Several other options were suggested, including a requirement that non-combustible stoppings be used at each end of the common cache, a requirement that steel boxes be placed in the wall accessible from both escapeways, a requirement that the cross-cut

requirements would provide incremental safety benefits over placing the rescue devices in the escapeways and that the options would be cheaper than the hardened room alternative, making common caches feasible for more mines.

MSHA referred to those comments in the preamble to its final rule. 71 Fed. Reg. 71,7430, 71,444 (Dec. 8, 2006). It explained that its primary concern with approving a common cache of devices was that the cache needed to be "secured against damage from explosions in either escapeway." *Id.* Underlying MSHA's analysis is the apparent belief that the redundancy provided by having separate sets of devices results in an increased likelihood that at least one set would survive an explosion. Thus, in order to justify collapsing the two sets into one, additional steps are required to ensure that an explosion would not destroy the devices in a common cache. Hardened rooms achieve this end because they are built to more rigorous specifications. *Id.* While other options might be cheaper, the hardened room meets the primary concern MSHA identified.

Though MSHA's explanation of its decision is short, it adequately addresses the major policy concerns raised and demonstrates a course of reasoned decisionmaking. The final rule, including the hardened room option, is not arbitrary and capricious.

## IV.

The Mining Association argues that MSHA failed to comply with the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12, because it did not analyze the economic impact of the hardened

---

rooms be made out of concrete and use heavy steel doors, and a requirement that airlocks between the escapeways be utilized to house the rescue devices.

room option. When promulgating a rule, an agency must perform an analysis of the impact of the rule on small businesses, or certify, with support, that the regulation will not have a significant economic impact on them. 5 U.S.C. §§ 603(a), 604(a), 605(b). When it published the temporary standard, MSHA certified that the primary method of compliance – placing a separate set of rescue devices in each emergency escapeway – would not have a significant economic impact on small businesses. 71 Fed. Reg. 12,252, 12,266-67 (Mar. 9, 2006). The Mining Association does not challenge the sufficiency of that certification. Since the primary method of compliance did not create a significant economic burden on small businesses, there was no reason for MSHA to undertake an economic analysis of the alternative. If the hardened room option is considerably more expensive, small businesses can simply refuse to choose it. *Compare Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 879 (9th Cir. 2003) (noting that the creation of cheaper alternative methods of compliance is one way to minimize the impact on small businesses).

For the foregoing reasons, the petition for review is denied.

*So ordered.*