**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA,**
Petitioner,

v.

**FEDERAL MINE SAFETY AND HEALTH ADMINISTRATION and William J. Tattersall, Assistant Secretary of Labor for Mine Safety and Health,**
Respondents,

**Quarto Mining Company, Intervenor.**

No. 89–1703.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 9, 1990.

Decided Jan. 25, 1991.

Earl R. Pfeffer, New York City, with whom Robert H. Stropp, Jr. and Mary Lu Jordan, Washington, D.C., were on the brief, for petitioner.

Jerald S. Feingold, Atty., Dept. of Labor, for respondents. Dennis D. Clark and David M. McConnell, Attys., Dept. of Labor, Washington, D.C., were on the brief for respondents.

Timothy M. Biddle, with whom Thomas C. Means and Susan E. Chetlin, Washington, D.C., were on the brief, for intervenor.

Before SILBERMAN, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge HENDERSON.

HENDERSON, Circuit Judge:

The Assistant Secretary for Labor, acting pursuant to section 101(c) of the Mine Safety and Health Act, 30 U.S.C. § 811(c) (1988), granted Quarto Mining Company's petition for modification of a mine safety regulation that regulates the permissible air flow in underground coal mines. This court recently reviewed a similar decision issued by the Assistant Secretary, in which he granted a modification of the same safety regulation at issue here, 30 C.F.R. § 75.326 (1990). *See International Union, United Mine Workers of America v. Mine Safety and Health Administration, and Cyprus Emerald Resources Corp.*, 920 F.2d 960 (D.C.Cir.1990) (*Emerald Mines*). Although the Assistant Secretary relied on somewhat different reasoning in these two decisions, we reach the same result here that we did in *Emerald Mines*: the Assistant Secretary's order is to remain in place but the matter is remanded in part for more reasoned decisionmaking.

## I.

Quarto Mining Company (Quarto) owns and operates a longwall mine in Clarington, Ohio—the Powhatan Number 4 Mine.[1] In brief, longwall mining involves the cutting of a series of tunnels, or entries, on both sides of a large seam of coal. These entries run for approximately one mile and then connect at the end to isolate a solid block of coal. The side of the block formed where these tunnels connect is the longwall; from the longwall the miners shear large panels of coal, slowly progressing towards the surface of the mine. As the panels are cut, they are broken up and sent out of the mine by conveyor belt. The conveyor belt used for this transport is contained within the belt entry to the mine, and this entry is kept physically separate from all other entries to the mine.

Quarto's mine, like many longwall mines, has a safety problem in that it is unable to ventilate properly the belt entry of the mine while also complying with existing safety standards. The safety regulations of the Mine Safety and Health Administration (MSHA) require mine operators to seal off the belt entry and prevent the air that travels through the belt entry from reaching the working face of the mine. 30 C.F.R. § 75.326 (1990) (section 75.326). This rule, section 75.326, can be complied with in one of two ways: the air traveling down the belt entry towards the working face of the mine can be funneled through a small-diameter pipe at the end of the entry and then "dumped" into a return-air entry; or fresh air that is used to ventilate the working face can be partially diverted and forced into the belt entry, thus causing the belt air to travel away from the working section of the mine. Joint Appendix (JA) 1046–47. In either case, compliance causes the air flow in the belt entry to slow to a near standstill and shift directions unpredictably. JA 786–87, 982–84, 1002. As a result of this undirected airflow, multiple hazards develop. For example, the reduced air flow enables methane layers to accumulate and thus increases the chance of fire and explosion. JA 872, 919–20, 940, 993–94, 1047–48. Also the lack of circulation causes air pressure to increase in the belt entry and this increased pressure in turn creates a risk that smoke from a belt fire will be forced directly into the low-pressure entry that provides both fresh air and a means of escape for the miners. JA 879, 968–69, 972–73, 1013–14, 1050. Finally, the reduced air flow results in a reduction of available oxygen and consequently creates the risk that belt fires will be extremely volatile, JA 790–91, 880–82, and difficult to extinguish because of the possibility that the fires will shift direction in an unpredictable and erratic manner, JA 783–84, 876, 878–79.

---

1. When Quarto first filed its petition in 1982, it operated a second longwall mine, the Powhatan Number 7 Mine. Since that time, however, the Number 7 Mine has been shut down and permanently sealed. *See* Quarto's Brief at 2, n. 4; Secretary of Labor's Brief at 6–7, n. 5. As a result, the modification granted for that mine is no longer at issue.

In response to the hazards caused by compliance with section 75.326, Quarto petitioned for a modification of that safety standard pursuant to section 101(c) of the Federal Mine Safety and Health Act of 1977. 30 U.S.C. § 811(c) (1988). In its petition, Quarto sought permission to unseal the belt entry and to course belt air into the working section of the mine. To ensure that the modification would not impair mine safety, Quarto proposed to install a sophisticated carbon monoxide (CO) smoke-alarm system that would allow for early-warning detection of belt entry fires. In response to the petition, MSHA conducted an investigation of the Quarto mine and proposed that the petition be denied. Quarto appealed the proposed denial, but, before the Administrative Law Judge (ALJ) heard the case, Quarto and the Administrator for Coal Mine Safety and Health entered into a consent decree. According to the decree, the Administrator in essence agreed to reverse his proposed denial. Despite the Administrator's reversal, the United Mine Workers of America (UMWA) continued to press for a denial of the petition and opposed the consent agreement. After conducting an extensive hearing on the issues, the ALJ granted Quarto's petition but imposed several conditions. Both Quarto and the UMWA appealed this decision to the Assistant Secretary; the Assistant Secretary granted the petition and also removed the special conditions imposed by the ALJ.

## II.

■■■ Section 101(c) provides two alternate means by which the Secretary of Labor may grant a petition for modification of a safety standard:

Upon petition by the operator or the representative of miners, the secretary may modify the application of any mandatory safety standard to a coal or other mine if the Secretary determines [1] that an alternative method of achieving the result of such standard exists which will at all times guarantee no less than the same measure of protection afforded the miners by such standard, or [2] that the application of such standard to such mine will result in a diminution of safety to the miners in such mine.

30 U.S.C. § 811(c). Each route for modification requires the Assistant Secretary[2] to conduct a distinct type of inquiry. As we decided in *Emerald Mines*, the "alternative method" standard, as defined by the Assistant Secretary, requires that the modification (i) "promote the specific safety goals of the original standard" and (ii) "achieve a net gain in mine safety ... taking all effects into account." 920 F.2d at 963. In certain circumstances, it can be difficult to conduct this inquiry. For example, when the existing safety regulation is either based on outmoded technology or inappropriate for newly developed mining techniques—as the Assistant Secretary apparently concluded is true here (*see, e.g.,* JA 233)—it rings false to conduct an inquiry into whether the proposed modification promotes the same safety goals as the existing regulation. In those circumstances, the analysis requires the Assistant Secretary to ask whether the proposed modification would provide as much safety as a regulation that itself may have less than satisfactory safety benefits. The "alternative method" standard also requires the Assistant Secretary to examine every disadvantage associated with the removal of the existing regulation and then to weigh these detriments against unrelated safety gains resulting from the proposed modification. *See Emerald Mines*, 920 F.2d at 963, 966. In contrast to the "alternative method" standard, the "diminution of safety" standard can be applied with relative ease. Because the "diminution of safety" standard requires the Assistant Secretary to ask only whether application of a particular mandatory safety regulation would be unsafe, the Assistant Secretary need not balance the efficacy of the existing rule against the net benefits produced by the proposed modification. In short, the "diminution of safety" standard requires the As-

---

**2.** The Secretary of Labor exercises her power to modify safety regulations through the Mine Safety and Health Administration, which is headed by the Assistant Secretary of Labor for Mine Safety and Health. 29 U.S.C. § 557a (1988).

sistant Secretary to compare only the safety level if the rule is applied with the safety level in the absence of the rule. *See* JA 238 (Assistant Secretary's decision).[3]

## III.

In his decision to grant Quarto's petition for modification, the Assistant Secretary relied on both the "alternative method" standard and the "diminution of safety" standard. In reviewing the Assistant Secretary's order, we conclude that he correctly applied the "diminution of safety" standard and accordingly do not reach the issue of the correctness of his treatment of the "alternative method" standard. Our only inquiry, then, is whether his findings are reasonable based on the record as a whole. *See generally Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 850–52 (D.C. Cir.1970).

In general, the Assistant Secretary's conclusion that the application of section 75.326 would diminish safety in the Quarto mine is sufficiently supported by evidence in the record. As the Assistant Secretary noted, JA 238–40, the evidence shows that compliance with section 75.326 results in dead air flow in the belt entry, *see, e.g.*, JA 786–87, 982–84, 1002, and that this dead air flow creates numerous hazards for the miners, *see, e.g.*, JA 790–91, 880–84 (volatile fires); 872, 940 (methane accumulation); 879 (hazardous fire fighting); 993–94 (risk of explosion); 968–69 (escape route endangered). The evidence also supports the Assistant Secretary's conclusion that the removal of the safety standard would allow safety hazards to be eliminated. Specifically, the evidence indicates

that increased air velocity would disperse the methane layers, *see, e.g.*, JA 874, 1049, create a positive air flow, *see, e.g.*, JA 1022, and decrease the volatility of belt entry fires, *see, e.g.*, JA 922–23. Accordingly, we accept the Assistant Secretary's decision that the application of section 75.326 to the Quarto mine results in a diminution of safety there.

The Assistant Secretary also articulated a reasonable basis for all but two of the specific provisions included in his order. First, the UMWA claims that the Assistant Secretary improperly reversed the ALJ's decision to require Quarto to build a fresh-air escapeway leading from the tailgate section of the mine.[4] The Assistant Secretary's decision to discard this requirement is based on the grounds that the evidence does not support a special need for an escapeway and that there is no evidence of the feasibility of building an escapeway. The Assistant Secretary also observes that a new regulation requires mine operators to construct travelways[5] behind longwalls, 30 C.F.R. § 75.222(g) (1990), and that these travelways will provide sufficient safety. JA 244. These findings, we believe, adequately explain the Assistant Secretary's decision not to require a tailgate escapeway.

Likewise, we reject the UMWA's contention that the Assistant Secretary erred in dismissing the threat that the conveyor belt might emit hazardous smoke caused by friction-heating which could not be detected by the proposed carbon monoxide sensors because it does not contain CO.

---

**3.** In some circumstances the Assistant Secretary may waive a safety standard under the "diminution of safety" standard while also imposing a condition on that waiver (as is the case here). Such a conditional waiver may appear similar to a waiver granted under the "alternative method" standard: in each instance an existing safety standard is suspended and a new, *ad hoc* safety standard is imposed. Despite the similarity in the results effected by the two types of waivers, however, a conditional waiver granted pursuant to the "diminution of safety" standard differs from a waiver granted under the "alternative method" standard because of the different inquiry the Assistant Secretary performs in each. As we noted, under the "diminution of

safety" standard, the Assistant Secretary is freed from the burden of comparing an existing (and allegedly ineffective) safety standard with its proposed replacement.

**4.** The "tailgate" is located on the side of the longwall that is the farthest from the fresh-air entry used for escape.

**5.** Travelways are similar to escapeways except that escapeways have minimum height and width requirements. *See* 30 C.F.R. § 75.1704–1 (1990) (escapeway); 30 C.F.R. § 75.222(g) (1990) (travelway).

The Assistant Secretary weighed heavily evidence which indicates that the conveyor belt used in the Quarto mine always emits smoke containing carbon monoxide. JA 237. Because the evidence cited by the Assistant Secretary supports this finding, we conclude that the Assistant Secretary properly decided this issue.[6]

Two provisions of the Assistant Secretary's decision, however, are not supported by the record and must be remanded for further consideration: (i) the Assistant Secretary's decision to remove entirely the velocity cap on the flow of air permissible in the belt entry, JA 234, 254; and, (ii) his decision to allow hand-held monitors to be used in the event the fixed carbon monoxide sensors malfunction, JA 245–47.

■ Regarding the decision to remove the velocity cap on the air coursed through the belt entry, the Assistant Secretary based his decision entirely on a report admitted into evidence after the hearings had closed. JA 217–18 (admission of report into evidence); 234 (Assistant Secretary credits report); 472–77 (report). This report concludes that the rubber belting used in Quarto's mine is less volatile when the air flow is 800 feet per minute (fpm) than when it is 300 fpm. By relying on this post-hearing evidence, the Assistant Secretary effectively denied the UMWA an opportunity to respond to the report and provide relevant data on the issue. Consequently the Assistant Secretary failed to allow for an adequate hearing on the subject and thereby failed to give necessary consideration to the issue. *See Emerald Mines*, 920 F.2d at 965–966; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

In addition, the Assistant Secretary's conclusion that the removal of the velocity cap will result in greater mine safety is without substantial support in the record. As noted above, the report relied on by the Assistant Secretary addresses only the volatility of mine fires when the velocity exceeds 300 fpm. The report makes no mention of how increased velocity will affect the miners' escape time, the effectiveness of the CO monitors or the dispersal of float dust and respirable dust. Indeed, all of the evidence that addresses these safety factors is based on the assumption that air velocity in the belt entry will not exceed 300 fpm—the velocity cap requested by Quarto in its petition. *See, e.g.,* JA 464–71 (MSHA report on effectiveness of CO monitors). Because of the Assistant Secretary's failure to consider these relevant safety concerns in making his decision, we cannot conclude that his decision to remove the velocity cap was proper. Accordingly, we remand this issue to the Assistant Secretary so that he can consider all of the relevant data and fully explain the reasoning for his decision. *See Emerald Mines*, 920 F.2d at 965–966; *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

The Assistant Secretary's reversal of the ALJ's requirement that the mine be shut down whenever the CO monitoring system malfunctions lacks sufficiently reasoned analysis. The ALJ found that hand-held monitors would not provide adequate detection of mine fires for two reasons. First, the hand-held monitors would have to be carried up and down the mines, thus creating the possibility that the monitors could be traveling away from incipient fires. JA 170. Second, the personnel carrying the hand-held monitors would not have constant communications with the surface and would be unable to provide the same "instantaneous" alert that is available when the fixed monitors are working. JA 171.

The Assistant Secretary dismissed the ALJ's concerns, concluding that hand-held

---

**6.** Admittedly the Assistant Secretary's decision is made somewhat confusing by his assertion that "[t]he record clearly indicates that the belts in use ... do emit *detectible* quantities of *non-CO smoke* along with the products of combustion." JA 237 (citations omitted; emphasis added). By referring to "detectible ... non-CO smoke" the Assistant Secretary's order might be read to imply that the smoke does not contain any carbon monoxide. But as the record reveals, the "non-CO" smoke referred to by the Assistant Secretary does in fact contain small yet detectible portions of carbon monoxide. *See* JA 889.

monitors would be as effective as fixed monitors. JA 246–47. In support of this conclusion, the Assistant Secretary relied on the testimony of a MSHA witness who responded affirmatively when asked whether hand-held monitors would provide "adequate" protection. JA 1063. That witness's testimony, however, does not support the Assistant Secretary's conclusion that hand-held sensors are "as effective in providing a warning as the continuous, integrated, mine monitoring system." JA 247. The witness testified that a hand-held monitor would provide adequate warning if "*a monitor* goes down." JA 1064 (emphasis added). From this testimony it is unclear whether the use of hand-held monitors would also be effective in the event of a total system failure. Indeed, as the ALJ noted, the evidence indicates that the use of hand-held detectors to monitor the entire mine would require the operators to travel up and down the mine every hour, and that this method of detection could fail to provide immediate response to a fire because an operator could be walking away from an incipient fire. JA 1095. The Assistant Secretary did not discuss this evidence and made no attempt to explain how roving patrols would provide as much safety as fixed monitors.

We also note that the testimony relied on by the Assistant Secretary was based on an assumption not borne out by the facts. As the Assistant Secretary conceded, the MSHA witness testified that "hand-held monitoring [would be] appropriate, . . . provided the person monitoring [has] *instantaneous communication,* both inby and outby." JA 246 (citing JA 1063; emphasis added). Because there is no evidence in the record that the operators have instantaneous communication with the surface, *see* JA 171, the expert witness's testimony raises the question whether hand-held monitors would be as safe as fixed monitors whenever the hand-held monitors must be carried up and down the mine entry. Given the conditional nature of the MSHA witness's testimony, we conclude that the Assistant Secretary did not provide sufficient reasoning to explain this conclusion.

IV.

As was true in *Emerald Mines,* the modification the Assistant Secretary approved has already been implemented by the mine operator. And as we concluded in *Emerald Mines,* the Assistant Secretary's order, in large part, is based upon reasoned decisionmaking. Accordingly, for the reasons enunciated there, 920 F.2d at 966–967, we allow the Assistant Secretary's order to remain in place while he reconsiders those portions of his order which we remand to him for more reasoned decisionmaking. Those portions include his decision regarding the removal of the velocity cap and the use of hand-held monitors.

*So Ordered.*